**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ASHLEY MARLISE PACK,**

        **Plaintiff,**

**v.**                              **Case No.: 2:13-cv-25249**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

        **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff Ashley Pack's (hereinafter "Claimant") application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable John T. Copenhaver, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion for summary judgment and the Commissioner's brief in support of her decision. (ECF Nos. 14 & 17).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

summary judgment be **DENIED**, that the Commissioner's request to affirm her decision be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On September 3, 2010, Claimant protectively filed for SSI benefits alleging a disability onset date of December 15, 1999, due to complications arising from attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, a foot injury, depression, and asthma.[1] (Tr. at 146-47). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration.[2] (Tr. at 77, 87). Claimant filed a request for an administrative hearing, (Tr. at 94), which was held on June 27, 2012, before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 32-62). By written decision dated July 6, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-25). The ALJ's decision became the final decision of the Commissioner on August 16, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an answer and a transcript of the administrative proceedings. (ECF Nos. 10 & 11). Claimant moved for summary judgment, and both parties filed memoranda in support of judgment in their favor. (ECF Nos. 14, 16, & 17). Accordingly, the matter is fully briefed and ready for resolution.

---

[1] Claimant's actual application for SSI was filed September 11, 2010. (Tr. at 149-52).

[2] Claimant had four previous applications for SSI benefits denied prior to her September 3, 2010 protective filing. (Tr. at 153-54).

## II.    Claimant's Background

Claimant was twenty-one years old at the time her September 2010 application, and twenty-three years old at the time of the ALJ's decision. (Tr. at 43, 149). She completed the eleventh grade and is able to communicate in English. (Tr. at 43, 146). Claimant previously worked at three restaurants for short periods of time, and at least two of those positions were part-time work. (Tr. at 228-31, 236).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.[3] 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §

---

[3] The inquiry also proceeds to the fifth step if the claimant has no past relevant work. 20 CFR § 416.920(g)(1).

416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since September 3, 2010, the

application date. (Tr. at 14, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "bipolar disorder, obesity, and asthma." (Tr. at 14, Finding No. 2). The ALJ considered Claimant's additional physical and mental impairments as evidenced by her medical records, including posttraumatic stress disorder ("PTSD"), oppositional defiant disorder ("ODD"), ADHD, histrionic personality traits, learning disorder, and borderline intellectual functioning, but the ALJ found these impairments to be non-severe. (Tr. at 14-15). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, or crawl. In addition, the claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards, such as unprotected heights and moving machinery. Further, the claimant can perform simple, routine, repetitive tasks, with no production rate or production pace work, with occasional decision-making, and occasional interaction with the public and coworkers.

(Tr. at 18, Finding No. 4). At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 23, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 24-25, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1988, and was defined as a younger individual; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because she did not have

any past relevant work. (Tr. at 24, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 24, Finding No. 9), including work as an assembler, kitchen worker, and hand packer. (Tr. at 24). Therefore, the ALJ concluded that Claimant was not entitled to SSI because she had not been under a disability, as defined in the Social Security Act, since September 3, 2010, the date the application was filed. (Tr. at 25, Finding No. 10).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant essentially raises two related challenges to the Commissioner's decision. First, Claimant insists that she meets the criteria for disability due to an affective disorder as contained in paragraph B of Listing 12.04 because she has marked restrictions in daily living and social functioning. (ECF No. 16 at 7-9). Second, Claimant contends that the ALJ violated the treating physician rule when he determined that Claimant did not meet the paragraph B criteria of Listing 12.04. (Tr. at 9-10). Claimant avers that the ALJ ignored opinions contained in a session information report completed by an employee of Prestera Centers for Mental Health Services ("Prestera"), where Claimant treated from December 2010 to May 2012. (*Id.*; Tr. at 983, 1219). In that report, Prestera's employee, Jessica Hamilton, B.A., assessed Claimant's level of functioning and reported that Claimant had "significant impairment" in activities of daily living, personal safety, "school/work," and social situations. (Tr. at 1174, 1180). Ms. Hamilton added that Claimant had "limited impairment" in accessing others and maintaining relationships. (Tr. at 1174).

In response, the Commissioner argues that Claimant does not meet the severity criteria outlined in paragraph B of Listing 12.04 because she has only mild limitations in

daily living; moderate limitations in social functioning and concentration, persistence, and pace; and two documented episodes of decompensation of extended duration. (ECF No. 17 at 10). Moreover, the Commissioner explains that the terms used in paragraph B to distinguish between different degrees of limitation are terms of art that directly correspond to specific legal definitions, and are not synonymous with the terms used by Ms. Hamilton when describing Claimant's functional capabilities. (Tr. at 9). Finally, the Commissioner asserts that Ms. Hamilton's opinion is entitled to no weight because it is inconsistent with the medical evidence in the record. (Tr. at 12-13).

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence, but has confined the summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

In December 2000, at age twelve, Claimant was admitted to William S. Hall Psychiatric Institute after she tried to commit suicide by cutting her left wrist with scissors; although her treating physician described the wound as a scrape and the intake nurse found the wound to be superficial. (Tr. at 474, 479, 489). Claimant reported that she tried to take her life because she had been sexually abused by a neighbor earlier that year. (Tr. at 474) Her physician recorded a history of attention deficit disorder and noted that Claimant was "quite dramatic." (Tr. at 474, 475). Upon mental status examination ("MSE"), Claimant reported feeling depressed and scared, and she described sometimes experiencing hallucinations. (Tr. at 479). Otherwise, her appearance, movements, speech, alertness, orientation, thought process, concentration, memory, fund of knowledge, judgment, and insight were not concerning. (*Id.*) At intake,

Claimant was diagnosed with post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and histrionic personality traits, with a differential diagnosis of depression not otherwise specified ("NOS"), and assigned a Global Assessment of Functioning ("GAF") score of forty-five.[4] (Tr. at 482). Claimant was given Ritalin, Paxil, Vistaril, and Zyprexa during her stay at the institute, and she was discharged eighteen days after her admission. (Tr. at 471, 484, 485, 488). The medications improved her sleep, decreased her nightmares, improved her mood stability, and brightened her affect. (Tr. at 472). At discharge, Patrick Butterfield, M.D., and Craig Stuck, M.D., diagnosed Claimant with PTSD, oppositional defiant disorder ("ODD"), and ADHD. (Tr. at 473). Drs. Butterfield and Stuck also found that Claimant exhibited histrionic personality traits, but she was much improved with a GAF score of seventy.[5] Claimant was given prescriptions for Ritalin, Paxil, and Zyprexa. (Tr. at 472-73).

In October 2001, at age thirteen, Claimant was admitted to Patrick B. Harris Psychiatric Hospital "as a danger to herself and others" after cutting herself on the neck. (Tr. at 517). An MSE revealed that, near the time of admission, Claimant had a pleasant attitude and euthymic affect with intact memory, attention, and concentration, a fund of knowledge from average to below average, limited insight, and impaired judgment. (Tr.

---

[4] The Global Assessment of Functioning ("GAF") Scale is a 100–point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 34.

[5] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

at 518-19). She denied suicidal ideation at the time of the MSE and stated that her suicidal behavior was attention seeking. (Tr. at 517, 519). Claimant was diagnosed with ADHD (by history), major depressive disorder (by history), rule out dysthymia, and histrionic and borderline traits. (Tr. 520). Claire Hyde, M.D., assigned a GAF score of twenty-five to thirty,[6] and Claimant was instructed to take Concerta, Glucophage, Paxil, and Vistaril. (*Id.*) Two days after Claimant's admission, she was again evaluated and diagnosed with borderline personality traits, rule out depression NOS, rule out residual PTSD, and ADHD (by history). (TR. at 572). A third evaluation of Claimant, eleven days after admission, produced a diagnosis of disruptive behavior disorder NOS and borderline and histrionic personality traits. (Tr. at 574). Thirteen days after admission, Brad Swavely, Ph.D., administered the Wechsler Intelligence Scale for Children, Third Edition, and noted that Claimant had a verbal IQ of seventy-four, a performance IQ of seventy-four, and a full-scale IQ of seventy-two, placing Claimant in the borderline range. (Tr. at 508). Dr. Swavely's diagnosis was rule out residual PTSD, ADHD, emerging Cluster B personality traits, and borderline IQ. (Tr. at 509). After eighteen days at the psychiatric hospital, Claimant was discharged with improvement in hyperactivity and distractibility, and no depressive or PTSD symptoms observed during hospitalization. (Tr. at 513, 515). Anca Amighi, M.D., performed an MSE shortly before discharge that revealed nothing of concern. (Tr. at 515). Dr. Amighi's discharge diagnosis was disruptive behavior disorder NOS, ADHD, and borderline intellectual functioning. It was recommended that Claimant continue outpatient treatment and

---

[6] A GAF score between 21 and 30 means that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 34.

medication, including Ritalin and Glucophage. (*Id.*) Claimant's discharge GAF score was sixty.[7] (*Id.*)

In November 2001, Claimant was assessed for special education services. (Tr. at 688). Sarah Clifford Mullis, Ed.S., a school psychologist, performed the evaluation. (Tr. at 694). Ms. Clifford Mullis reported hearing from Claimant's middle school teacher that Claimant was disruptive in class with attention-seeking behaviors, and that she had significant difficulty getting along with classmates. (Tr. at 689). After having Claimant complete a number of tests, Ms. Clifford Mullis determined that Claimant's cognitive functioning fell within the slow-learner range and that Claimant had strong verbal skills, but weak short-term memory skills. (Tr. at 694). Ms. Clifford Mullis also recorded that Claimant self-reported significant levels of physiological anxiety, social anxiety, and depression. (*Id.*) Ms. Clifford Mullis concluded that Claimant met the criteria for "receiving services as a student with an emotional disability." (*Id.*)

In May 2004, Claimant visited the Spartanburg Area Mental Health Center because her school doctor had left the position and Claimant needed medication. (Tr. at 746). She reported that she was doing well with her medications, including Concerta, Geodon, and Zoloft, and that she wanted to continue taking medication. (Tr. at 746, 748). Claimant's provider recorded that Claimant had moderately severe issues with concentration, suicidal ideas, and intellectual functioning. (Tr. at 749). The treater added that Claimant possessed "quite a problem" with psychosocial stressors and an extremely severe issue with thought content. (*Id.*) Claimant was diagnosed with ADHD and ODD, and she was assigned a GAF score of sixty. (Tr. at 750).

---

[7] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

In August 2004, Claimant treated with Lori Barwick, M.D. (Tr. at 726). Claimant stated that she was "doing very well" with the nightmares that she had in the past and that she was also "doing well with depression." (*Id.*) Dr. Barwick's MSE of Claimant revealed that she was well-groomed, her speech was regular, her mood was good, her affect was full-range, she had no suicidal ideation, she had no recent hallucinations and rarely had nightmares, and she was alert and attentive. (Tr. at 727). Dr. Barwick diagnosed Claimant with ADHD (by history); PTSD in partial remission; history of depression, resolved; ODD; and borderline intellectual functioning. (*Id.*) Claimant was assigned a GAF score of sixty. (*Id.*) Dr. Barwick prescribed Concerta and noted that she discussed Zoloft with Claimant, but found a prescription for Zoloft unnecessary because Claimant's mood had been "very stable" when not taking the drug. (Tr. at 728).

Claimant again visited Dr. Barwick in September 2004, and Claimant reported that her mood had been "very stable." (Tr. at 725). Nothing concerned Dr. Barwick upon MSE. (*Id.*) Dr. Barwick once again prescribed Concerta. (*Id.*)

In October 2004, Claimant underwent a psychoeducational evaluation performed by Sandra Gill Clark, M.S., N.C.S.P., for the purpose of "provid[ing] updated information regarding [Claimant's] developmental skill levels." (Tr. at 703). Ms. Gill Clark noted that Claimant's teacher reported she had at least basic literacy levels with reading skills at a seventh grade level, math skills at a fourth to sixth grade level, and content areas at a fifth grade level. (Tr. at 705). However, Claimant exhibited inappropriate behaviors in class. (*Id.*). Therefore, Ms. Gill Clark recommended that Claimant's individualized education program team consider continued placement in the most appropriate, least restrictive educational setting, and that the team focus on increasing Claimant's emotional health and behavioral control as well as academic

achievement. (*Id.*)

Claimant followed-up with Dr. Barwick twice more in 2004. (Tr. at 722, 724). In November, Dr. Barwick recorded that Claimant's mood had been "fairly stable" and that there were no recent problems in school. (Tr. at 724). During Claimant's MSE, she was "very quiet," but showed affect and denied thoughts of self-harm. (*Id.*) Dr. Barwick recommended that Claimant continue to take Concerta. (*Id.*) At her December appointment, Claimant was easily engaged, "showed a lot of affect," and denied any thoughts of self-harm. (Tr. at 722). Dr. Barwick again instructed Claimant to continue taking Concerta. (Tr. at 723).

In March 2005, Claimant again visited Dr. Barwick. (Tr. at 721). A representative from Claimant's school accompanied her and reported that Claimant was in trouble for a specific instance of unacceptable behavior at school, but otherwise her behavior had been stable and her grades were "excellent." (*Id.*) Dr. Barwick recorded that Claimant had no thoughts of self-harm and recommended that she continue to take Concerta. (*Id.*)

Claimant next treated with Dr. Barwick in May 2005. (Tr. at 720). Upon MSE, Dr. Barwick recorded that Claimant "appear[ed] to crave drama," but denied thoughts of self-harm. (*Id.*) Dr. Barwick noted that Claimant had "a lot of histrionic features," and recommended that Claimant continue to use Concerta. (*Id.*)

Claimant returned to Spartanburg Area Mental Health Center in June 2005 for an initial clinical assessment. (Tr. at 740). Claimant's treater recorded that she was "very calm and happy" at the appointment, but had moderately severe issues with concentration, suicidal ideas, and psychosocial stressors. (Tr. at 743). Claimant's diagnosis did not change from the May 2004 assessment (ADHD and ODD), and she

was assigned a GAF score of sixty. (Tr. at 744).

In August 2005, Claimant returned to Dr. Barwick. (Tr. at 719). Claimant stated that her mood was stable, and upon MSE, she was easily engaged with a bright affect, goal-directed thoughts, and no thoughts of self-harm. (*Id.*) Dr. Barwick recorded that Claimant's diagnosis remained as ADHD, ODD, history of PTSD, and "a lot of histrionic features." (*Id.*) Dr. Barwick assigned a GAF score of sixty, and prescribed Ritalin. (*Id.*)

Claimant followed-up with Dr. Barwick in September 2005. (Tr. at 718). During the MSE, Claimant was initially quiet, but became more engaging as the interview went on. (*Id.*) Dr. Barwick recorded that Claimant's thoughts were goal-oriented and that she denied any thoughts of self-harm. (*Id.*) Claimant's diagnosis and GAF score remained the same, and Dr. Barwick recommended that she continue to use Ritalin. (*Id.*)

Claimant next visited Dr. Barwick in December 2005. (Tr. at 716). Claimant stated that she had been expelled from school. (*Id.*) Dr. Barwick observed during the MSE that Claimant was "very argumentative at times with her grandmother" and immature in decision-making, but had goal-directed thoughts and no thoughts of self-harm. (*Id.*) Dr. Barwick recorded that Claimant's diagnosis "remained ADHD, ODD, history of PTSD, and histrionic features along with borderline intellectual functioning." (*Id.*) Claimant was assigned a GAF score of fifty, and Dr. Barwick recommended that she continue to use Ritalin and reinitiate both individual and family therapy. (Tr. at 716-17).

In March 2006, Claimant again saw Dr. Barwick. (Tr. at 715). Claimant reported that her mood had been stable, her schooling through a homebound program was going well, and she had been exercising. (*Id.*) Upon MSE, Dr. Barwick observed that Claimant was cooperative, had goal-directed thoughts, and did not have any thoughts of self-harm. (*Id.*) Dr. Barwick assigned a GAF score of sixty, and Claimant's diagnosis

remained unchanged. (*Id.*) Claimant was instructed to keep taking Ritalin. (*Id.*)

In October 2006, after missing several appointments beginning in April 2006, Claimant was discharged from treatment at Spartanburg Area Mental Health Center where she had treated from May 2004 to February 2006.[8] (Tr. at 746, 733, 762, 771). Claimant was discharged for "drop[ping] out or reject[ing] services." (Tr. at 762). The discharge summary notes that Claimant made no progress on her established goals for treatment and ran away from her grandmother's home to California. (*Id.*) The discharge summary also states that Claimant's discharge diagnosis was ADHD, ODD, PTSD (by history), histrionic personality traits, and borderline intellectual functioning. (*Id.*)

Claimant next sought mental health treatment in December 2010[9] at Prestera.[10] (Tr. at 983). Mohamed Elawady, M.D., performed Claimant's initial psychiatric evaluation. (Tr. at 985). Claimant informed Dr. Elawady that she was a "cutter" and that she had a history of abuse, bipolar disorder, and ADHD. (Tr. at 983). Claimant reported "mood swings ranging between depressed to angry, disturbed sleep and appetite," and feeling "helpless at times with passive suicidal ideations." (*Id.*) Claimant stated that she "cuts" when angry or depressed, and that she had racing thoughts, poor concentration, and distractibility. (*Id.*) Claimant also reported experiencing auditory and visual hallucinations, paranoid ideations, and ideas of reference. (*Id.*) Upon MSE, Dr. Elawady observed that Claimant's general appearance was appropriate, and she was alert with a

---

[8] The relevant medical records from Claimant's treatment at Spartanburg Area Mental Health Center are summarized above. The remainder of the medical documents in the record from Claimant's treatment there contain little information and much of that information is not particularly useful here.

[9] At the June 2012 hearing, Claimant explained that her abusive husband prevented her from seeking mental health treatment during the period between 2006 and 2010. (Tr. at 44).

[10] At a July 2007 visit with Michael Tanbonliong, M.D., for foot pain, Claimant reported that she had no issues related to concentration, excessive daytime sleeping, memory loss, anxiety, suicidal thoughts, mental problems, depression, and hallucinations. (Tr. at 803-04). She reported the same at her September 2007 visit with Dr. Tanbonliong. (Tr. at 800, 802).

guarded demeanor. (*Id.*) Dr. Elawady also documented that Claimant's affect was appropriate, her speech was rapid, her thoughts were neither suicidal nor homicidal, and her thought processes demonstrated "flight of ideas." (Tr. at 984). Claimant was diagnosed with "bipolar I disorder, most recent episode depressed, severe with psychotic features," and assigned a GAF score of thirty-five.[11] (Tr. at 984-85). Dr. Elawady determined that Claimant's prognosis was fair with therapy and medication. (Tr. at 984). He prescribed Geodon as well as individual and group therapy. (Tr. at 984).

Claimant returned to Prestera in March 2011, and again treated with Dr. Elawady. (Tr. at 990). Claimant disclosed that she had not been taking her medication and that she felt sad with racing thoughts. (*Id.*) Claimant also stated that her sleep and appetite were adequate, and she had not experienced any psychotic symptoms or suicidal thoughts. (*Id.*) Claimant further informed Dr. Elawady that she had not partaken in self-injurious behavior. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, coping ability, affect, and motor activity were all normal and appropriate. (Tr. at 990-91). He diagnosed Claimant with "bipolar I disorder, most recent episode depressed, severe with psychotic features" and PTSD. (Tr. at 992). Claimant was assigned a GAF score of 55. (*Id.*) Dr. Elawady instructed Claimant to restart her medication (Geodon) and referred her to therapy. (*Id.*)

Claimant next visited Dr. Elawady the following month. (Tr. at 986). She reported that she was compliant with her medications and less nervous than before.

---

[11] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

(*Id.*) Claimant also stated that she was getting along with her boyfriend and that her appetite and sleep were adequate. (*Id.*) She disclosed that she occasionally had racing thoughts and a sad mood, but that these occurred less than before. (*Id.*) Claimant denied any thoughts of helpless, hopelessness, and suicide, and she also denied any psychotic symptoms. (*Id.*) Dr. Elawady recorded that Claimant's appearance, sociability, speech, thought content, recall memory, and affect were all normal and appropriate. (Tr. at 986-87). Claimant's diagnosis remained unchanged, and Dr. Elawady assigned a GAF score of sixty. (Tr. at 988). Dr. Elawady increased Claimant's Topamax prescription and prescribed Vistaril as well as Seroquel. (*Id.*)

In July 2011, Claimant was admitted to Prestera's Crisis Residential Unit for suicidal ideation. (Tr. at 1018). She reported that her mind raced "constantly," she had mood swings, and she had problems with sleep. (*Id.*) Mary Devaul-Eshleman, M.D., recorded that this was Claimant's "third psychiatric inpatient hospitalization." (*Id.*) Dr. Devaul-Eshleman diagnosed Claimant with "bipolar I disorder, most recent episode depressed, severe with psychotic features," and assigned a GAF score of forty. (Tr. at 1020).[12] The day after Claimant's admission, she stated that she felt calmer and that Klonopin helped with her anxiety. (Tr. at 994). Claimant also stated that her feelings of panic ceased and that her mind racing had slowed down. (*Id.*) Dr. Devaul-Eshleman recorded that Claimant's appearance, sociability, recall memory, sleep, and appetite were all normal and appropriate, although her speech was slurred, her thought content demonstrated flight of ideas, and her affect was restricted. (*Id.*) During an MSE, Claimant reported no suicidal and homicidal thoughts. (Tr. at 995). Dr. Devaul-Eshleman's diagnosis remained the same, and Claimant was assigned a GAF score of

---

[12] Much of the medical record from this visit is blank.

forty. (Tr. at 996).

The next day, Claimant reported that she felt calmer. (Tr. at 998). Dr. Devaul-Eshleman noted that Claimant was less sedated and that her mood swings had decreased. (*Id.*) Dr. Devaul-Eshleman observed that Claimant's appearance, sociability, speech, recall memory, sleep, and appetite were all normal and appropriate, but her thought content again demonstrated flight of ideas, her affect was labile, and her motor activity was agitated. (Tr. at 998-99). Dr. Devaul-Eshleman diagnosed Claimant with "bipolar I disorder, most recent episode depressed, severe with psychotic features" and PTSD. (Tr. at 1000). Claimant was assigned a GAF score of thirty-five. (*Id.*)

The following day, Claimant reported that she was feeling better and denied any complaints. (Tr. at 1002). Andy Tanner, M.D., recorded that Claimant's mood was excellent. (*Id.*) Dr. Tanner also determined that Claimant's appearance, sociability, speech, thought content, recall memory, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1002-03). Dr. Tanner assigned a GAF score of thirty-five and ordered no medication changes. (Tr. at 1004).

The next day of Claimant's hospitalization, she again denied any complaints. (Tr. at 1006). Dr. Tanner observed that Claimant's appearance, sociability, speech, thought content, recall memory, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1006-07). He recorded that Claimant's affect was labile and her coping skills were deficient, but Claimant denied suicidal and homicidal thoughts. (Tr. at 1007). Dr. Tanner assigned a GAF score of forty and recorded that Claimant may be discharged the following day. (Tr. at 1008).

Claimant was discharged on July 18, 2011, after being hospitalized for five days. (Tr. at 1012). She informed Dr. Devaul-Eshleman that her mood and sleep were "good."

(Tr. at 1010). Dr. Devaul-Eshleman observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1010-11). Dr. Devaul-Eshleman also recorded that Claimant's coping ability was improving, and she denied suicidal and homicidal thoughts. (*Id.*) Claimant's discharge GAF score was forty. (Tr. at 1012).

Two days after being discharged, Claimant followed-up with Dr. Elawady. (Tr. at 1014). Dr. Elawady noted that Claimant had been admitted previously after suicidal attempts following the death of her uncle and conflicts with her husband. (*Id.*) Claimant informed Dr. Elawady that her relationship with her husband was improving and that she was still grieving her uncle. (*Id.*) She denied mood swings, racing thoughts, psychotic symptoms, and suicidal and homicidal thoughts. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, sleep, and appetite were all normal and appropriate. (Tr. at 1014-15). Dr. Elawady assigned a GAF score of forty and instructed Claimant to continue taking her medications, including Tegretol, Seroquel, and Topamax. (Tr. at 1014, 1016).

Claimant next treated with Dr. Elawady in August 2011. (Tr. at 1181). Lisa Pressley, a behavioral rehabilitation specialist and Claimant's care coordinator who transported Claimant to her appointments, recorded that Claimant had felt anxious since her hospitalization and Claimant was paranoid that someone was going to break into her apartment while she was gone that day. (Tr. at 1222). At the appointment, Claimant reported that she was taking her medications and that she had adequate sleep and appetite.[13] (Tr. at 1181). She also informed Dr. Elawady that she was occasionally

---

[13] Claimant also denied any side effects from taking the medications. (Tr. at 1181). Claimant repeatedly denied any side effects at later appointments as well. *See, e.g.*, Tr. at 1185. However, she testified at the June 2012 hearing that her medications caused severe drowsiness and nausea. (Tr. at 54, 56).

sad or irritable and that she occasionally experienced crying spells or arguments, but that she did not feel hopeless, helpless, suicidal, or homicidal. (*Id.*) Claimant also denied any psychotic symptoms. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, sleep, and appetite were all normal and appropriate. (Tr. at 1181-82). He assigned a GAF score of forty and instructed Claimant to continue using her current medications. (Tr. at 1183).

Claimant again visited Dr. Elawady two weeks later. (Tr. at 1185). She conveyed that she was taking her medications and she felt less sad and less irritable. (*Id.*) Claimant reported "mild racing thoughts," but denied psychotic symptoms as well as suicidal and homicidal thoughts. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, sleep, and appetite were all normal and appropriate. (Tr. at 1185-86). He noted that Claimant had deficient coping skills. (Tr. at 1186). Dr. Elawady assigned a GAF score of forty and directed Claimant to continue taking her medications. (Tr. at 1187).

Claimant next treated with Dr. Elawady on September 14, 2011.[14] (Tr. at 1189). Claimant stated that she was taking her medications, but that she had not been attending therapy.[15] (*Id.*) According to Claimant, her sleep and appetite were fair. (*Id.*) She denied any psychotic symptoms. (*Id.*) Claimant reported that she had been diagnosed with a liver disease and that she had low energy and felt sad, irritable, and nervous as a result of this diagnosis. (*Id.*) She also reported feeling hopeless and

[14] Between the August 2011 appointment with Dr. Elawady and the September 2011 appointment, Claimant often spoke with Ms. Pressley. *See, e.g.*, Tr. at 1234. Ms. Pressley reported no increase in psychological symptoms during that period. *See, e.g.*, *id.*

[15] Although, at a September 13, 2011 appointment at the Charleston Area Medical Center, Claimant reported that she was no longer taking her "prescribed psych meds." (Tr. at 1133).

helpless at times, but denied any suicidal or homicidal ideations. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1189-90). Dr. Elawady assigned a GAF score of forty, and he ordered that Claimant continue to take her medications, but decreased her Seroquel dose and began her on Trazodone. (Tr. at 1191-92).

On September 29, 2011, Claimant reported to the Charleston Area Medical Center Emergency Department complaining of a laceration on her left wrist. (Tr. at 1112). She stated that she was helping someone hang a mirror and cut her wrist on the mirror.[16] (*Id.*) Claimant also informed her treating physician, Leon Kwei, M.D., that she was taking Topamax, Klonopin, Seroquel, and Tegretol. (*Id.*) Dr. Kwei observed that Claimant's mood, affect, judgment, and memory were appropriate. (*Id.*) Claimant's wrist was cleaned and repaired with a topical skin adhesive. (*Id.*)

Claimant again visited with Dr. Elawady on October 26, 2011. (Tr. at 1193). She stated that she ran out of her medications over one week before her appointment. (*Id.*) She reported feeling stressed, irritable, tired, and sad with decreased sleep and appetite. (*Id.*) Claimant denied suicidal or homicidal thoughts, but reported "suicidal ideations with superficial cut on her left forearm."[17] (*Id.*) Dr. Elawady recorded that Claimant's appearance, speech, thought content, recall memory, affect, and motor activity were all normal and appropriate. (Tr. at 1193-94). He also observed that Claimant was withdrawn and possessed deficient coping skills. (*Id.*) Dr. Elawady assigned a GAF score

---

[16] Ms. Pressley transported Claimant to the emergency department. (Tr. at 1241). Claimant informed her that the cut occurred when she and her boyfriend were moving a fish tank. (*Id.*) At the June 2012 hearing, Claimant testified that she had cut herself that day because she did not want to live anymore. (Tr. at 47).

[17] Claimant also reported to Ms. Pressley on October 18, 2011 that she had been cutting to try and "hurt herself." (Tr. at 1243).

of fifty. (Tr. at 1196). Dr. Elawady increased Claimant's Trazodone dose, stopped her Seroquel intake, restarted her on Tegretol and Topamax, and prescribed her Klonopin. (*Id.*)

Claimant followed-up with Dr. Elawady in November 2011. (Tr. at 1197). She reported that she was taking her medications and that she had a decrease in sleep, but good appetite. (*Id.*) She also stated that she felt sad and irritable, but denied self-injurious behaviors and suicidal or homicidal ideations. (*Id.*) Dr. Elawady observed that Claimant's appearance, sociability, speech, thought content, recall memory, affect, and motor activity were all normal and appropriate. (Tr. at 1197-98). Dr. Elawady again noted that Claimant's coping ability was deficient. (Tr. at 1198). He assigned a GAF score of fifty-five and instructed Claimant to continue taking her medications with an increase in Trazodone. (Tr. at 1199).

On December 13, 2011, Claimant returned to Prestera. (Tr. at 1201). She reported taking her medications as well as "good sleep and appetite." (*Id.*) She also stated that her mood was "good" and denied any self-injurious behaviors or suicidal ideations. (*Id.*) She informed Dr. Elawady that she had spent time with her friends at Thanksgiving and enjoyed it. (*Id.*) Dr. Elawady noted that Claimant's appearance, sociability, speech, thought content, recall memory, affect, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1201-02). He observed that her coping skills were improving. (Tr. at 1202). Dr. Elawady assigned a GAF score of fifty-five and ordered Claimant to continue her medications and therapy. (Tr. at 1203).

Claimant also visited with Jessica Hamilton, B.A., that day for a non-physician mental health assessment. (Tr. at 1168). According to Ms. Hamilton, the purpose of the visit was "for an update assessment to gather information regarding the frequency and

acuity of [Claimant's] currently active symptoms of Bipolar as well as to identify their strengths and supports. Document the history of the consumer's presenting illness including: consumer's presenting problem, history of presenting problem, intensity/duration of symptoms, medications, and efficacy of medications." (*Id.*). Ms. Hamilton relied entirely upon Claimant as the source of the information. Claimant informed Ms. Hamilton that she had been depressed, withdrawn, isolated, nervous, angry, and anxious. (*Id.*) She also described experiencing crying spells. (*Id.*) Claimant denied suicidal thoughts and psychotic symptoms. (*Id.*) Ms. Hamilton determined that Claimant possessed no "high risk factors" and described Claimant as "motivated for treatment." (*Id.*) Ms. Hamilton observed that Claimant was withdrawn and overwhelmed, but that her affect, speech, thought content, recall memory, motor activity, sleep, and appetite were all normal and appropriate. (Tr. at 1169-70). Ms. Hamilton recommended that Claimant continue treating with a psychiatrist. (Tr. at 1168).

On December 14, 2011, Ms. Hamilton completed a nine-page database form that compiled information about Claimant regarding a variety of topics. (Tr. at 1172). In that database form, Ms. Hamilton completed a section entitled Level of Functioning, in which the level of Claimant's impairment in six functional areas was rated. Ms. Hamilton documented that Claimant had significant impairment in activities of daily living, personal safety, "school/work," and social situations. (Tr. at 1174). Ms. Hamilton added that Claimant had limited impairment in accessing others and maintaining relationships. (*Id.*) Ms. Hamilton also noted that Claimant was taking Klonopin, Tegretol, and Topamax, and that those medications effectively reduced Claimant's symptoms. (Tr. at 1175).

Claimant next treated at Prestera in January 2012 when she visited Elizabeth McClellan, M.D. (Tr. at 1205). Dr. McClellan noted that Claimant had a diagnosis of bipolar disorder, ADHD, fetal alcohol syndrome, a long history of physical and sexual abuse, and a history of cutting herself. (*Id.*) Dr. McClellan also recorded that Claimant had a history of suicide attempts and non-compliance with medications. (*Id.*) Claimant informed Dr. McClellan that she had been taking her medications and that she was doing "very well." (*Id.*) Claimant also stated that she had not been cutting and that she did not have suicidal thoughts. (*Id.*) Dr. McClellan observed that Claimant's sociability, speech, thought content, recall memory, affect, motor activity, and sleep were all normal and appropriate. (Tr. at 1205-06). Dr. McClellan also described Claimant's appearance as bizarre and her coping ability as deficient. (*Id.*) Dr. McClellan diagnosed Claimant with "bipolar I disorder, most recent episode mixed, moderate" and assigned a GAF score of fifty-five. (Tr. at 1207). Claimant was instructed to continue taking Trazodone, Tegretol, Klonopin, and Topamax. (Tr. at 1208).

Claimant again visited Dr. McClellan in March 2012. (Tr. at 1209). Claimant communicated that she had been doing well on her medications and that her mood was stable with no mood swings and no depression. (*Id.*) Claimant also stated that she had not been cutting. (*Id.*) Dr. McClellan determined that Claimant's appearance, sociability, speech, thought content, recall memory, affect, motor activity, and sleep were all normal and appropriate. (Tr. at 1209-10). Dr. McClellan noted that Claimant's coping ability was improving and that Claimant denied suicidal thoughts. (Tr. at 1210). Dr. McClellan's diagnosis of Claimant remained unchanged, and she assigned a GAF score of sixty. (Tr. at 1211). Dr. McClellan ordered that Claimant continue to take Trazodone, Tegretol, Klonopin, and Topamax. (*Id.*)

Claimant's final visit with a Prestera physician was in April 2012 when she again treated with Dr. McClellan. (Tr. at 1213). Claimant reported that her mood was stable and that she wanted to stay on her current medications. (*Id.*) Dr. McClellan recorded that Claimant's appearance, sociability, speech, thought content, recall memory, coping ability, affect, motor activity, and sleep were all normal and appropriate. (Tr. at 1213-14). Claimant also denied suicidal thoughts. (Tr. at 1214). Dr. McClellan's diagnosis of Claimant remained the same, and she assigned a GAF score of sixty. (Tr. at 1215). Dr. McClellan discontinued Topamax due to Claimant's reported kidney stones and continued Claimant on Klonopin, Trazodone, and Tegretol. (Tr. at 1216). Dr. McClellan also recommended that Claimant begin taking folic acid. (*Id.*)

Claimant was discharged from the Prestera program after completing treatment in May 2012. (Tr. at 1219). Claimant informed Ms. Pressley that she planned to move out of state in July 2012 and both agreed that discharge was appropriate in May. (*Id.*) Claimant stated that she was taking her medications and seeing a psychiatrist and that she would continue to do so when she moved.[18] (*Id.*) Claimant also reported that she was doing well. (*Id.*) Ms. Pressley noted that Claimant had not received any care coordination services since February 2012. (*Id.*)

### B. Mental Evaluations and Opinions

On July 26, 2007, Ron Thompson, Ph.D., completed a psychological evaluation of Claimant that included an MSE, interview, and various tests.[19] (Tr. at 794-96). Dr. Thompson observed that Claimant was calm, pleasant, and cooperative. (Tr. at 794). He

---

[18] Claimant stated in her brief that as of April 2014, she was still receiving mental health treatment. (ECF No. 16 at 4 n.2).

[19] While there are a number of physical evaluations and opinions in the record, the undersigned focuses on the mental evaluations and opinions given the nature of Claimant's challenge to the ALJ's decision.

also noted that Claimant exhibited no unusual behavior, hyperkinesis, or attention deficiency. (*Id.*) According to Dr. Thompson, as soon as Claimant entered the room, she stated that she was bipolar, and that was the reason she was applying for disability benefits. (*Id.*) During the MSE, Dr. Thompson observed that Claimant was slightly anxious with a "rather even mood that does brighten and affect becomes full range." (*Id.*) Dr. Thompson noted that Claimant was a "quick responder and communicate[d] her thoughts and feelings adequately." (*Id.*) Claimant understood and could follow simple directions. (*Id.*) Her thought process was "intact, goal-directed, and relevant, but a bit concrete consistent with intellect as was insight and judgment." (*Id.*) Claimant displayed "good cognitive spontaneity, but poor memory for dates and time line." (*Id.*) Claimant described experiencing mood swings, including one that morning, but Dr. Thompson found Claimant's description of her mood at the examination to be inconsistent. (Tr. at 794-95). Claimant displayed "fair problem solving capability," and her speech was coherent. (*Id.*) She denied any "pathological ideation, compulsion, obsession, or hallucination." (Tr. at 794-95). She reported to Dr. Thompson that she had attempted suicide multiple times and that her last attempt involved taking an overdose of medication, which resulted in her admission to Patrick B. Harris Psychiatric Hospital. (Tr. at 794).

Dr. Thompson administered a Wechsler Adult Intelligence Scale, Third Edition, ("WAIS-III") test as well as a Wide Range Achievement Test, Third Edition ("WRAT3"). (Tr. at 795). On the WAIS-III, Claimant scored a verbal IQ of seventy-eight, a performance IQ of seventy-nine, and a full-scale IQ of seventy-seven, which placed her in the "upper range of the borderline range of intellectual functioning." (*Id.*) On the WRAT3, Claimant scored a reading grade equivalency of fifth grade, which Dr.

Thompson found was consistent with her verbal comprehension scores on the WAIS-III. (Tr. at 796). Dr. Thompson noted that Claimant's scores suggested "capability in a variety of simple to repetitive types of work task with fair pace and persistence, if she were so motivated." (*Id.*) However, Dr. Thompson observed that "motivation may be problematic for [Claimant] due to apparent dependency on disability in the past and personality issues." (*Id.*)

Dr. Thompson's diagnostic impression included "mathematics disorder; learning disorder NOS; report of bipolar disorder, rule out; rule in anxiety disorder, NOS, mild-moderate; history of [ADHD] (appears resolved with maturity); [and] borderline-low average cognitive functioning as tested today." (*Id.*) He concluded that Claimant was pleasant and could respond appropriately to the spoken word, including following simple directions. (Tr. at 797). He also noted again that Claimant may lack motivation to seek employment given her past reliance on disability benefits and some of her "borderline and dependent features." (*Id.*)

On March 8, 2011, Ernie Vecchio, M.A., performed a disability determination evaluation that included a clinical interview and an MSE.[20] (Tr. at 936). Claimant reported to Mr. Vecchio that she was bipolar, depressed, and anxious. (Tr. at 937). She stated that she was diagnosed with ADHD and that she could not "handle actual work" due to the stress work caused her to experience. (*Id.*) Claimant relayed that her typical day involved waking up in the afternoon, eating, and playing a game on her laptop. (Tr. at 940). In the evenings, Claimant watched television and ate dinner with her boyfriend then went to sleep around 10:00 p.m. (*Id.*) On the date of the evaluation, Claimant

---

[20] Prior to this evaluation, Rosemary Smith, Psy.D., completed a psychiatric review technique on November 3, 2009. (Tr. at 822). Dr. Smith found insufficient evidence of a medically determinable psychiatric impairment. (*Id.*).

reported feeling sad and informed Mr. Vecchio that she experienced crying spells once per week. (Tr. at 937). Claimant also explained that she cut herself when she felt stressed or depressed. (*Id.*)

During the MSE portion of the evaluation, Mr. Vecchio found Claimant's hygiene and grooming to be adequate and her attitude to be cooperative. (Tr. at 938). Claimant's sociability, speech, judgment, and psychomotor behavior were all within normal limits. (*Id.*) Her mood was sad, and her affect was constricted. (*Id.*) Her thought process was consistent with the intent of the examination, and her thought content was focused on her social discomfort and mood. (Tr. at 938-39). Mr. Vecchio recorded that Claimant's insight was poor and she had suicidal or homicidal ideation without plan or intent. (Tr. at 939). Claimant's immediate memory was mildly deficient, her recent memory was moderately deficient, and her remote memory was mildly deficient. (*Id.*) Claimant's concentration was moderately deficient based on a digit span test score of three. (*Id.*) Her persistence and pace were both mildly deficient. (*Id.*)

Mr. Vecchio diagnosed Claimant with bipolar I disorder and borderline intellectual functioning (by history). (Tr. at 940). He described Claimant's prognosis as poor and her social functioning as mildly deficient based on her "level of response and adaptive functioning." (*Id.*)

On March 10, 2011, Jeff Boggess, Ph.D., completed a mental RFC assessment. (Tr. at 943, 945). In the category of understanding and memory, Dr. Boggess concluded that Claimant was not significantly limited except that she was moderately limited in her "ability to understand and remember detailed instructions." (Tr. at 943). In the category of sustained concentration and persistence, Dr. Boggess determined that Claimant was not significantly limited except that she was moderately limited in her "ability to carry

- 28 -

out detailed instructions." (Tr. at 943-44). In the category of social interaction, Dr. Boggess characterized Claimant as not significantly limited except that she was moderately limited in her "ability to interact appropriately with the general public." (Tr. at 944). Dr. Boggess also concluded that Claimant was not significantly limited in the category of adaptation. (*Id.*) After noting that Claimant stated in her disability function report that she "walks, uses public transport, shops in stores, watches tv [*sic*], writes in journal, socializes [with] boyfriend and neighbor, talks to family on phone, goes to dr appts [*sic*], [and] walk [*sic*] 10 steps/rest fifteen minutes," Dr. Boggess remarked that Claimant possessed the ability to perform one or two-step work activities with limited contact with the general public. (Tr. at 945).

On March 10, 2011, Dr. Boggess also provided a psychiatric review technique based on Claimant's treatment and testing records, Mr. Vecchio's disability evaluation, and Claimant's disability function reports. (Tr. at 948, 960). Dr. Boggess determined that Claimant suffered from borderline intellectual functioning (Listing 12.02) and "bipolar syndrome with a history of episodic periods manifested by the full symptomatic pictures of both manic and depressive syndromes (and currently characterized by either or both syndromes)," (Listing 12.04). (Tr. at 949, 951). However, in addressing the paragraph B criteria of the Listings, Dr. Boggess concluded that Claimant only experienced mild restriction of activities of daily living and moderate difficulties in both maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. at 958). Dr. Boggess noted that Claimant had no episodes of decompensation of extended duration. (*Id.*) Dr. Boggess also determined that Claimant did not meet the paragraph C criteria of the Listings. (Tr. at 959). Dr. Boggess stated that Claimant alleged all possible limitations on her disability function report, but her current MSE

showed only "mild social limitations and moderate concentration difficulties (memory assessed as mild/moderately limited)." (Tr. at 960). He assessed Claimant's allegations as "partially credible."[21] (*Id.*)

On July 2, 2011, P. Polizos, M.D., completed a case analysis. (Tr. at 981). Dr. Polizos noted that Claimant was independent "in all of her personal and extended activities of daily living." (*Id.*) Dr. Polizos also stated that Claimant was able to prepare meals, clean her house, and go shopping. (*Id.*) Dr. Polizos observed that Claimant reported having several acquaintances and that medication kept her condition stable. (*Id.*) Dr. Polizos concluded that Claimant's mental impairment was mildly to moderately severe and did not meet any Listing. (*Id.*) As such, Dr. Polizos adopted and affirmed the initial evaluation and decision as written. (*Id.*)

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine

---

[21] Subhash Gajendragadkar, M.D., also found Claimant to be partially credible in a physical RFC completed on April 18, 2011. (Tr. at 976, 978).

whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

### A. Treating Physician Rule

Addressing Claimant's related arguments in reverse order, Claimant insists that the ALJ violated the treating physician rule when he determined that Claimant did not meet the paragraph B criteria of Listing 12.04. (ECF No. 16 at 9-10). Specifically, Claimant contends that the ALJ ignored "opinions" by Ms. Hamilton of Prestera, concluding that Claimant had significant impairments in several areas of functioning. (*Id.*)

Ms. Hamilton first met with Claimant on December 13, 2011. (Tr. at 1168). She interviewed Claimant for the purpose of a non-physician mental health update assessment and prepared a "Clinical Interpretative Summary" of the visit. (Tr. at 1168-1171). On December 14, 2011, Ms. Hamilton completed a nine-page, computer-generated database form about Claimant, titled "Prestera Center, Inc. - Level 1," which consisted of various informational sections that had to be populated. These sections covered such topics as demographics, address, clinical information, race and ethnicity, living arrangements, school and legal, treatment history, income and assistance, federal reporting data, support system, substance abuse history, presenting problems, symptom

history, symptom acuity, medications, and others. (Tr. at 1172-1180). The database form also contained a section entitled "Level of Functioning," which listed six separate functional areas to be rated. (*Id.*) In this section, Ms. Hamilton recorded that Claimant had "significant impairment" in the functional areas of activities of daily living, personal safety, school/work, and social situations. (Tr. at 1174). Ms. Hamilton further documented that Claimant had "limited impairment" in accessing others and maintaining relationships. (*Id.*) Although the ALJ referenced in his written decision some of the findings and notations contained in Ms. Hamilton's records, he did not assign weight to, or even mention, the Level of Functioning ratings.

20 C.F.R. § 416.927(c) outlines how the opinions of acceptable medical sources should be weighed in determining whether a claimant qualifies for disability benefits. In general, the SSA gives more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(c)(1). Even greater weight is allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 416.927(c)(2). Indeed, the "treating physician rule" requires a treating physician's opinion to be given controlling weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* § 416.927(c)(2). However, the treating physician rule only applies to acceptable medical sources. SSR 06-03P, 2006 WL 2329939, at *2; *see also, e.g.*, *Bushey v. Colvin*, 552 F. App'x 97, 97 (2d Cir. 2014) (holding "treating source rule" does not apply to physician assistant because physician assistant is not "acceptable medical source"). Under the regulations, "acceptable medical sources" include licensed physicians and licensed psychologists, and for the purpose of establishing certain

impairments, include licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

In this case, the record does not demonstrate, and Claimant has not argued, that Ms. Hamilton falls within the definition of acceptable medical sources. The only evidence of Ms. Hamilton's qualifications is that she possesses a Bachelor of Arts degree, which establishes that she is not a physician, optometrist, podiatrist, or qualified speech-language pathologist. (Tr. at 1171, 1180). Moreover, she is not a licensed psychologist given that the State of West Virginia requires a psychologist to have at least a Master's Degree in Psychology, or a Doctorate of Philosophy, or its equivalent, before seeking licensure.[22] Accordingly, Claimant's contention that the ALJ erred by failing to give Ms. Hamilton's "opinion" controlling weight is not persuasive.

Nevertheless, the Commissioner may use evidence from other sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.913(d). Social Security Ruling 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources and non-medical sources should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not acceptable medical sources, but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

---

[22] West Virginia Code § 30-21-7.

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.
>
> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time . . .

2006 WL 2 329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. SSR 06-03P, 2006 WL 2329939, at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the

***consideration*** of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6 (emphasis added). However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case." Id.* at *6 (emphasis added). The Ruling requires the ALJ to apply a common sense standard. For example, in an atypical case, when an "other source" opinion is given more weight than a "treating physician" opinion, and the decision is not fully favorable to the claimant, the ALJ **must** explain the reasons for the weight given to the two opinions. *Id.* On the other hand, the Ruling implicitly allows the ALJ leeway not to discuss an opinion from an "other source" that is duplicative or cumulative of opinions already addressed in the decision, that is tangential to the outcome, or that is integrated or adopted in another opinion explicitly weighed by the ALJ. *See, e.g., Love-Moore v. Colvin,* No. 7:12–CV–104–D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (holding that "the language in SSR 06–03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory.") This interpretation of the Ruling is consistent with the general principle that although the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F.Supp. 2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ

specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-CV-20, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

Turning back to the nine-page database form completed by Ms. Hamilton on December 14, 2011, the written decision substantiates that the ALJ considered Ms. Hamilton's notes, *see* Tr. at 22 (citing fact related to Claimant's amount of sleep solely contained in Ms. Hamilton's records), but the ALJ did not expressly weigh the ratings found in the Level of Functioning section. Nonetheless, the undersigned does not find the absence of this discussion to constitute error for several reasons. First, there is nothing in the record to corroborate Claimant's contention that the Level of Functioning section actually contains opinions by Ms. Hamilton. The database form appears include background, demographic, and historical information collected for purposes of Prestera's patient management, billing, and reporting activities. The form does not specify the source of the information used to complete each section, although some sections obviously are populated by client response and some are populated by using information in existing psychiatric records. For example, sections regarding treatment history, support system, and duration of symptoms require client input, while psychiatric diagnosis is taken directly from the existing treatment record. The Level of Functioning section, in particular, falls within a series of sections that appear to be populated based largely upon client responses, thus suggesting that the ratings of "limited" and "significant" were based on the self-assessments of Claimant, rather than opinions of Ms. Hamilton.

Even assuming that the Level of Functioning ratings were Ms. Hamilton's opinions, the ALJ did not err when he overlooked them in his written decision. The ALJ simply was not required to discuss every aspect of the database form in its entirety, or assign particular weight to various sections of the form. *See* 20 C.F.R. § 416.913(d) (noting that Commissioner *may* use such evidence); SSR 06-03P, 2006 WL 2329939, at *6 (providing that Commissioner should explain how "other source" opinions are weighed when they *may* have an effect on the outcome of the case); *Neff v. Colvin*, No. 3:13-cv-638, 2014 WL 4851898, at *4 (W.D.Ky. Sept. 29, 2014) (holding ALJ did not err in failing to address social worker's report because evaluation of social worker's opinion "is permissible, but not required"); *Deaver v. Colvin*, No. 5:13-cv-05776, 2014 WL 4639888, at *8, *23 (S.D.W.Va. Sept. 16, 2014) (adopting PF&R wherein magistrate judge recognized that ALJ may consider "other source" opinions, but ALJ not required to assign specific weight to those opinions); *Adkins v. Colvin,* No. 4:13–cv–00024, 2014 WL 3734331, at *3 (W.D.Va. July 28, 2014) (holding that ALJ not required to explain weight given to other source opinions unless they affect the outcome of the case); *Mitchell v. Comm'r of Social Security*, No. 13-10178, 2014 WL 1230036, at *7 (E.D.Mich. Mar. 25, 2014) (recognizing ALJ not always required to explain weight given to "other source" opinions); *Craig v. Chater,* 76 F.3d 585, 590 (4th Cir. 1996) (holding that ALJ's consideration of medical evidence "more than adequate" even though physical therapist's report was not explicitly discussed).

Certainly, the failure to address opinions from "other sources" may require remand under some circumstances. *See, e.g.*, *McNeely v. Colvin*, No. 2:13-cv-767, 2014 WL 4929437, at *12 (S.D.W.Va. Sept. 30, 2014) (collecting cases where remand was appropriate based on ALJ's failure to adequately explain weight assigned to "other

source" opinions); *Jackson v. Colvin*, No 9:13-741, 2014 WL 4079372, at *4 (D.S.C. Aug. 14, 2014) ("The fact that providers deemed 'acceptable medical sources' are given special treatment under the Social Security Act does not mean, however, that the opinions of other providers, such as counselors, social workers, and teachers, are to be ignored in evaluating a claim of disability."). Courts that have found error in an ALJ's failure to fully explain the weight given to the opinion of an "other source" have generally done so when the other source had an established treatment relationship with the claimant, provided a clear, cogent and supported opinion, and the ALJ discounted the opinion simply because it did not come from an acceptable medical source. Those cases can be readily distinguished from the present case. Here, Claimant had no treatment relationship with Ms. Hamilton; instead, Claimant met Ms. Hamilton for a single update assessment, which primarily consisted of her collecting Claimant's basic information, treatment history, and current symptoms. *Cf. McNeely*, 2014 WL 4929437 at *13-*14 (remanding where licensed social worker and professional counselor who treated claimant for at least one year provided "other source" opinion and ALJ assigned "little weight" to opinion without discussing factors in 20 C.F.R. § 404.1527). Indeed, it appears from the record that Ms. Hamilton had no prior experience with Claimant and was unfamiliar with her treatment course. This impression grows stronger when comparing Ms. Hamilton's documentation with notes prepared on the very same day by Claimant's treating psychiatrist at Prestera. *Compare* Tr. at 1168 (Claimant informing Ms. Hamilton that she has anxiety attacks) *with* Tr. at 1201 (Claimant denying similar attacks when visiting Dr. Elawady); *Compare* Tr. at 1169-70 (Ms. Hamilton describing Claimant's appearance as disheveled, her sociability as withdrawn, and her coping ability as overwhelmed) *with* Tr. at 1201-02 (Dr. Elawady describing Claimant's

appearance and sociability as within normal limits and her coping ability as improving). These discrepancies tend to greatly diminish the value of Ms. Hamilton's observations, particularly in view of Dr. Elawady's expertise in the field and his long-standing treatment relationship with Claimant. The ALJ thoroughly reviewed and summarized the medical evidence in the record from Claimant's treating providers at Prestera, including Claimant's Global Assessment of Functioning scores that were documented on the same day as Ms. Hamilton's assessment and on the same database form as the Level of Functioning ratings. (Tr. at 21-22). Therefore, the ALJ discussed the relevant medical evidence surrounding and including Ms. Hamilton's documentation and provided a written assessment of the Prestera records that is sufficiently clear to a subsequent reviewer.

Second, the print-out of the database form does not include a key, a menu, or any definitions; accordingly, the record is silent as to what Ms. Hamilton meant by the terms "limited" and "significant;" whether the terms were part of an available menu; were defined by the database or by some other source; and what severity range was used by Ms. Hamilton when she populated the form. The lack of any context around the terms relegates the ratings of "limited" and "significant" to meaningless jargon. Moreover, without knowing the gradations available to the person populating the form or performing the assessment, it is impossible to compare the ratings to the severity criteria of paragraph B. If, for instance, the only choices on the form were "none," "limited," and "significant," the term "significant" is far less meaningful and useful when correlating to Listing 12.04 than if the choices also included "moderate" and "disabling." Therefore, the ambiguity of the form effectively rendered it incidental to the ALJ's decision-making process.

Finally, the database form and associated records, when taken as a whole, factually undermine Claimant's position. Claimant's argument relies entirely upon the supposition that the term "significant" when used in the database is synonymous with the term "marked" as it is used in paragraph B of Listing 12.04. This argument is unavailing when viewing the other contemporaneous records prepared by Ms. Hamilton. As previously stated, the day prior to completion of the database form, Ms. Hamilton met with Claimant for the first, and perhaps only time,[23] for the purpose of conducting a non-physician mental health assessment.[24] (Tr. at 1168-1171). After completing the assessment and preparing her comments, Ms. Hamilton documented Claimant's DSM diagnosis "as of 12/13/2011." (Tr. at 1170). She noted that the diagnosis was made by Claimant's psychiatrist, Dr. Mary Deveul-Eshleman. At Axis V of the diagnosis—the Global Assessment of Functioning Scale—Dr. Eshleman scored Claimant's functioning as a 55. (Tr. at 1171). A GAF score of 55 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34. The same GAF score is documented on the database form on December 14, 2011, (Tr. at 1178), and all of Claimant's symptoms that day are rated as "moderate," "mild," or "not present" on the symptom

---

[23] The December 14, 2011 record does not indicate that Claimant was present at Prestera when the database was completed. It appears likely that the database was prepared from information gathered during Ms. Hamilton's December 13, 2011 interview with Claimant and from the existing records.

[24] As stated previously, Ms. Hamilton's credentials are unclear, although she definitely is not a physician or licensed psychologist. She likewise is not an independent clinical social worker, a certified social worker, or a graduate social worker, as to be licensed in any one of these positions, an individual must have obtained a Master's Degree in social work. *See* West Virginia Code §§ 30-30-8; 30-30-10; 30-30-12, respectively. An individual can be a licensed social worker with a Bachelor's Degree; however, a search of West Virginia's public database for licensed social workers (www.wvsocialworkboard.org) reveals no results for the name "Jessica Hamilton." According to Prestera's website, an individual with a Bachelor's Degree can qualify for the position of case manager, which involves performing assessments, advocating, linking, and treatment planning. *See* www.Prestera.org/prestera/careers.

acuity scale. (Tr. at 1176-77). Thus, Claimant's documented level of functional impairment according to her psychiatrist, and her severity of symptoms as recorded by Ms. Hamilton, were no worse than moderate.

The written decision reflects that the ALJ relied upon the December 2011 GAF scores when determining the "degree of limitation" in the "'paragraph B' mental function analysis." (Tr. at 18, 22). When choosing between the GAF score of 55 and the Level of Functioning ratings, which both appear in the same database form, the ALJ reasonably selected the GAF score as Prestera's opinion evidence of Claimant's level of functioning. Unlike the ambiguous terms used in the Level of Functioning section relied upon by Claimant, the term "moderate," as defined in the GAF scale at least appears to roughly correspond with the term "moderate" as used in paragraph B of Listing 12.04.[25] In order to meet the severity criteria of paragraph B, Claimant must show that her mental disorder results in at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. § 404, Subpart P,

---

[25] That is not to say that a GAF score directly correlates to the severity criteria of Listing 12.04. *See Powell v. Astrue,* 927 F.Supp.2d 267, 273 (W.D.N.C. 2013). As the court points out in *Powell,* a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning ... a snapshot of functioning at any given moment ... [and] is thus not dispositive of anything in and of itself and has no direct legal or medical correlation to the severity requirements of social security regulations." *Id.* (citations omitted.) The decision of the American Psychiatric Association to retire the GAF scale in 2013, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice," DSM-5 at p. 16, supports the view that a GAF score may have somewhat limited evidentiary value in determining whether a claimant meets a listed impairment. Even still, in this case, Claimant's GAF scores were conceptually clearer, more consistent, and more statistically sound than the Level of Functioning ratings contained in the database form. At least the GAF scores were assigned by Claimant's regular psychiatrists, used a universal scoring system, and were based on their treatment experience with Claimant. In contrast, the source of and basis for the Level of Functioning ratings are unknown, and the scale used is unclear. Therefore, while neither the GAF scores nor the Level of Functioning ratings would have been dispositive of whether Claimant met the Listing, the ALJ opted to rely upon the more sound of the two measurements.

App. 1, ¶ 12.04B. The term "marked" is defined as "**more than moderate** but less than extreme," and a marked impairment exists when "the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at ¶ 12.00C. (emphasis added). Accordingly, the very records relied upon by Claimant to establish that she meets Listing 12.04B, to the contrary, weigh in favor of a finding that she does not meet the severity criteria.

Thus, bearing in mind that the ALJ was not required to discuss each piece of evidence in the record, and more specifically, that the ALJ was not required to summarize and assign weight to all "other source" statements, the undersigned concludes that the ALJ did not err by refraining from specifically addressing the Level of Functioning ratings in his written decision even though the record demonstrates that the ALJ reviewed Ms. Hamilton's records. This is particularly so because the Level of Functioning ratings would not have had an effect on the outcome of the case given their questionable nature. In addition, the ALJ's decision is sufficiently clear to permit the undersigned to comprehend the ALJ's reasoning and analysis of the Prestera evidence.

Therefore, the undersigned **FINDS** that the ALJ did not err in failing to address and weigh Ms. Hamilton's database findings and **RECOMMENDS** that the District Court find this challenge to be without merit.

### B. Paragraph B of Listing 12.04

Claimant also insists that the ALJ incorrectly found that she does not meet the requirements of the paragraph B criteria for Listing 12.04.[26] (ECF No. 16 at 8). Claimant

---

[26] Both parties agree that the ALJ impliedly found that Claimant met the requirements of paragraph A for Listing 12.04. (ECF No. 16 at 8 n.6; ECF No. 17 at 9).

asserts that she meets the criteria for disability due to an affective disorder as contained in paragraph B because she has marked restrictions in daily living and social functioning. (*Id.* at 9). Much of her argument relies on the alleged opinions of Ms. Hamilton and the treating physician rule, which are dispatched with above, but Claimant also generally asserts that the ALJ's decision as to paragraph B is not supported by substantial evidence. (*Id.* at 8).

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

In addressing whether Claimant met the paragraph B criteria for Listing 12.04, the ALJ found that Claimant was only mildly restricted in activities of daily living because she had the ability to care for her personal needs, prepare simple meals, care for her pets, perform household chores, spend time with her boyfriend, play cards, write in her journal, make photograph albums, walk, go to the park, listen to music,

and watch television. (Tr. at 17). The ALJ also supported his finding by citing Mr. Vecchio's evaluation of Claimant. (*Id.*) Claimant reported to Mr. Vecchio that a typical day involved using her laptop, playing games, having dinner with her boyfriend, and watching television. (*Id.*)

As for social functioning, the ALJ determined that Claimant had only moderate difficulties. (Tr. at 17) The ALJ noted that Claimant went outside "a couple of times a month," and was capable of using public transportation, but could not go out alone. (*Id.*) In making his determination, the ALJ also relied on Claimant's ability to shop in stores for food and household items as well as her willingness to spend time with her neighbor, family, and live-in boyfriend. (*Id.*) The ALJ also highlighted that Claimant performed activities with others, although she stated that she had difficulty getting along with others because of her bipolar disorder. (*Id.*) The ALJ again relied on Mr. Vecchio's evaluation, and Mr. Vecchio determined that Claimant had "mildly deficient social functioning based on her level of response and adaptive functioning during the evaluation." (*Id.*)

With regard to concentration, persistence, or pace, the ALJ concluded that Claimant had moderate difficulties. (Tr. at 17) In reaching this conclusion, the ALJ cited Claimant's statements that she needed reminders to take care of her personal hygiene, to take medications, and to go places. (*Id.*) The ALJ also recognized that Claimant indicated she was unable to manage her finances, could not count money, and had problems with following written and spoken directions as well as paying attention. (*Id.*) The ALJ noted that Mr. Vecchio concluded that Claimant possessed moderate deficiencies in concentration and mild deficiencies in persistence and pace. (Tr. at 18).

Finally, as for episodes of decompensation, the ALJ found that Claimant experienced one to two episodes of decompensation, each of extended duration. (*Id.*) Particularly, the ALJ noted that Claimant was admitted to Prestera in July 2011 after attempting suicide. (*Id.*)

The ALJ's conclusion that Claimant does not meet the paragraph B criteria for Listing 12.04 is supported by substantial evidence. Claimant insists that her activities of daily living and social functioning are markedly restricted. (ECF No. 16 at 9). However, the ALJ's determination that her restrictions of daily living were mild and that her restrictions in social functioning were moderate garners substantial support from the record.

First, as to restrictions of daily living, Claimant asserted in her August 2009 disability function report that she is able to take care of her personal hygiene, dress, feed herself, watch television, take care of her pets by feeding and bathing them, make her own food, clean her house sometimes, go shopping for food and household supplies, play cards, make photograph albums, and go for walks with her boyfriend. (Tr. at 187-91). In her October 2010 disability function report, Claimant wrote that she no longer took care of her pets, but had help from her boyfriend in feeding and bathing them. (Tr. at 221). She also stated that she had no issues in personal care other than needing help to get to the bathroom and needing reminders to brush her teeth, bathe, and take medication. (Tr. at 222). Claimant recorded that she could prepare meals and that she no longer performed household chores, but when she did it took "all day." (*Id.*) Claimant disclosed that when she went out in public, which she rarely did, she would walk or use public transportation. (Tr. at 223). She also shopped for food and household items. (*Id.*) As for hobbies, Claimant stated that she liked to watch

television, write in her journal, and spend time with her boyfriend. (Tr. at 224). In her May 2011 disability function report, Claimant stated that she was again taking care of her pets by feeding them. (Tr. at 248). She listed no issues with personal care other than needing reminders to bathe, care for her hair, use the toilet, and take medications. (Tr. at 248-49). Claimant reported that she could prepare meals, do the dishes, go outside twice per month, use public transportation, and shop for food. (Tr. at 249-50). The information contained in these reports supports the ALJ's determination.

Medical expert findings also reinforce the ALJ's conclusion as to Claimant's restrictions of daily living. At the March 2011 examination with Mr. Vecchio, Claimant's hygiene and grooming were adequate. (Tr. at 936). She reported that her typical day involved "mostly" sleeping along with eating, using her laptop to play games, and spending time with her husband eating dinner and watching television. (Tr. at 940). In his March 2011 psychiatric review technique, after thoroughly reviewing the record, Dr. Boggess observed that Claimant only experienced mild restriction of activities of daily living. (Tr. at 958, 960). Dr. Boggess's decision was later affirmed by Dr. Polizos. (Tr. at 981).

At the June 2012 hearing, Claimant testified that she occasionally would drive to the store if Ms. Pressley did not drive her and that she needed Ms. Pressley to shop with her because she could not shop on her own. (Tr. at 46). However, Ms. Pressley noted at the time of discharge that Claimant had not used care coordination services from Prestera since February 2012, (Tr. at 1219), and Claimant states in her brief that she was only "under the assistance of Ms. Pressley for the performance of her activities of daily living from July 2011-November 2011." (ECF No. 16 at 6 n.4). Claimant also

testified at the hearing that she slept "fair" on her medications but that they made her very drowsy to the point where she could not even sit up some days. (Tr. at 54). Although, as the ALJ pointed out, Claimant repeatedly denied any side effects from taking the medications at her Prestera appointments. (*See, e.g.*, Tr. at 1181, 1185). Claimant's hearing testimony is insufficient to assail the ALJ's conclusion on restrictions of daily living.

Ultimately, Claimant has not pointed to specific evidence, other than Ms. Hamilton's notations, which Claimant mistakes as those of a treating physician, to contradict the ALJ's finding on the degree of her daily living restrictions. Claimant seems to make the overarching argument that even when she adheres to her medication regiment, her symptoms are apparent and uncontrolled. (ECF No. 16 at 4-6). Although, the record shows that Claimant, at least once, stated she was taking her medication when she in fact was not. *Compare* Tr. at 1133 (On September 13, 2011, Claimant states to doctor at Charleston Area Medical Center she was no longer taking her "prescribed psych meds") *with* Tr. at 1189 (On September 14, 2011, Claimant informed Dr. Elawady she was taking her prescribed medications). Dr. McClellan also noted that Claimant had a history of non-compliance with medications, which the record shows to be accurate. (Tr. at 1205). The record does demonstrate, however, that when Claimant was hospitalized and medication consumption was ensured, her symptoms were effectively controlled. (*See, e.g.*, Tr. at 1010-12). Additionally, while Claimant accuses the ALJ of "cherry-picking" medical evidence to support his findings, it is in fact Claimant who selectively scrutinizes the record. For example, Claimant cites to one record from Ms. Pressley's conversations with Claimant where Claimant stated she was cutting and feeling sad, irritable, and helpless. (ECF No. 16 at 5; Tr. at 1243).

However, it is unclear whether Claimant was on medication at the time of that conversation as she informed Dr. Elawady eight days later that she had not taken her medications in over one week. (Tr. at 1193). Moreover, Claimant overlooks that Ms. Pressley often recorded no increase in psychological symptoms after talking with Claimant. (*See, e.g.*, Tr. at 1239).

Claimant similarly summarizes the treatment records from physicians at Prestera by highlighting her subjective complaints and ignoring other pertinent information, including the treating physician's findings and diagnoses after performing an MSE. For instance, Claimant relies on a medical record to support her claim from October 26, 2011, when she admitted she had not taken her medications in over a week. (ECF No. 16 at 5; Tr. at 1193). Another example—Claimant relies on a medical record from November 2011 where she complained that she was sad, irritable, and helpless. (ECF No. 16 at 5, Tr. at 1197). Yet, in that same record, Claimant's MSE was completely normal other than deficient coping skills and inadequate sleep, and Dr. Elawady assigned her a GAF score of fifty-five, (Tr. at 1197-99), which indicates only ""[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34. In sum, Claimant has failed to point to specific record evidence that supports her position that she experiences marked restriction in activities of daily living. Adequate record evidence supports the ALJ's determination as to this issue.

Second, as to restriction of social functioning, Claimant claimed in her disability function reports that she was able to talk on the phone with family, go shopping, go on walks, cook and watch television with her live-in boyfriend, spend time with her

neighbor, go out to eat, and go to the mall. (Tr. at 187, 190, 191, 224, 251). Claimant testified at the June 2012 hearing that she goes shopping for food, goes to her doctor appointments, and occasionally goes to Wal-Mart with her boyfriend. (Tr. at 57-58). Although, Claimant asserted in her disability function reports that her bipolar condition causes her difficulty in getting along with others, including authority figures. (Tr. at 192, 225-26, 252-53).

As for medical expert findings on the subject, Mr. Vecchio described Claimant's social functioning as mildly deficient based on her "level of response and adaptive functioning." (Tr. at 940). Dr. Boggess determined in his mental RFC assessment that Claimant was not significantly limited in her ability to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 944). The only limitation that the mental RFC notes in social interaction is that Clamant is moderately limited in her ability to interact appropriately with the general public. (*Id.*) In his psychiatric review technique, Dr. Boggess concluded that Claimant had moderate difficulties in maintaining social functioning. (Tr. at 958). This decision was affirmed by Dr. Polizos. (Tr. at 981).

Again, Claimant cannot point to evidence, other than Ms. Hamilton's alleged opinions, to support her contention as to the social functioning criterion of paragraph B. Instead, Claimant relies on selective medical records that do not accurately represent Claimant's limitations. Indeed, many of the medical records from Prestera demonstrate that Claimant's sociability was often within normal limits. (*See, e.g.*, Tr.

at 1181, 1185, 1189, 1197, 1201, 1205, 1209, 1213). Additionally, toward the end of her treatment with Prestera, Claimant was frequently assigned GAF scores by her treating physicians indicating that she had only "moderate difficulty in social, occupational, or school functioning." DSM-IV at 34; (Tr. at 1199, 1203, 1207, 1211, 1215). Given Claimant's disability function reports, her testimony at the hearing, the treatment records, and the expert medical findings, the ALJ's conclusion that Claimant suffers from only moderate difficulties in social functioning is supported by substantial evidence.[27]

Accordingly, the undersigned **FINDS** substantial support on the record for the ALJ's determination that Claimant did not meet the diagnostic criteria for disability under paragraph B of Listing 12.04 and **RECOMMENDS** that the District Court find that the ALJ's determination is supported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANT** the Commissioner's request to affirm, (ECF No. 17), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

---

[27] Claimant does not argue that she has marked difficulty in maintaining concentration, persistence, or pace. She also does not contend that she has experienced three episodes of decompensation within one year or an average of one episode every four months, with each episode lasting for at least two weeks. *See* C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(4). The record is clear that Claimant does not meet the decompensation criterion, and therefore, her difficulties in maintaining concentration, persistence, or pace, even if marked, would not by themselves meet the paragraph B criteria of Listing 12.04. *See id.* at ¶ 12.04(B).

hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  October 27, 2014.

Cheryl A. Eifert
United States Magistrate Judge